988 F.2d 750
 UNITED STATES of America, Plaintiff-Appellee,
v.
Bernard GOINES, Ellen J. Moreland, Sterling Daniels, a.k.a.
"ST", a.k.a. "Turk", Kenneth Smith, a.k.a "Mookie", a.k.a.
"Little Mook", Anthony Gray, a.k.a. "Illinois Tony", Lloyd
Daniels, a.k.a. "D", Anthony White, a.k.a. "A.D.", Leonard
E. Walker, Jr., a.k.a. "L.A.", Debra Henry, Timothy Z.
Taylor, Danny Eppenger, Michael Daniels, a.k.a. "Chicken",
and Jimmy Sloan, Defendants-Appellants.
 Nos. 91-1185, 91-1276, 91-1356, 91-1363, 91-1550, 91-1606,
91-1619, 91-1648, 91-1726, 91-1734, 91-1881,
91-1892 and 91-2145.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 21, 1992.
Decided March 17, 1993.
As Amended April 29, 1993.
Rehearing and Rehearing En Banc Denied May 25, 1993.
 
 R. Jeffrey Wagner, Asst. U.S. Atty. (argued), Maxine A. White, Asst. U.S. Atty., William J. Lipscomb, Milwaukee, WI, for U.S. in Nos. 91-1185 and 91-1734.
 Bernard Goines, pro se.
 David Berman, Milwaukee, WI, for Bernard Goines.
 R. Jeffrey Wagner, Asst. U.S. Atty. (argued), John E. Fryatt, U.S. Atty., Milwaukee, WI, for U.S. in No. 91-1276.
 Thomas J. Awen, Fields & Associates, Brookfield, WI, for Ellen J. Moreland.
 R. Jeffrey Wagner, Asst. U.S. Atty. (argued), Milwaukee, WI, for U.S. in Nos. 91-1356, 91-1363, 91-1550, 91-1606, 91-1619, 91-1648, 91-1726, 91-1881, 91-1892 and 91-2145.
 Robert N. Meyeroff (argued), Bernard S. Stein, Milwaukee, WI, for Sterling Daniels.
 James C. McNeely, McNeely & Associates, Milwaukee, WI, for Kenneth Smith.
 Patricia E. Bender, Chicago, IL, for Anthony Gray.
 Gregory G.H. Rihn, Poulos, Sengstock & Budny, West Allis, WI, for Lloyd Daniels.
 Kevin O'Neill, Milwaukee, WI, for Anthony D. White.
 Richard L. Zaffiro (argued), West Allis, WI, for Leonard E. Walker, Jr.
 Russell Goldstein, Hiller & Frank, Milwaukee, WI, for Debra Henry.
 Robert J. Dvorak (argued), Dvorak & Fincke, Milwaukee, WI, for Timothy Z. Taylor.
 Morris D. Berman (argued), Giesen & Berman, Madison, WI, for Danny Eppenger.
 Daniel W. Hildebrand (argued), Ross & Stevens, Madison, WI, for Michael Daniels.
 Howard S. Sicula, Atinsky, Kahn, Sicula & Teper, Milwaukee, WI, for Jimmy Sloan.
 Before CUDAHY, FLAUM, and KANNE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 In 1988, law enforcement agents in Milwaukee began tracking the activities of a drug trafficking operation associated with a gang known as the Brothers of Struggle (BOS). Two years later, fifteen defendants were charged in a thirty-six count indictment with conspiring to possess and distribute cocaine, possessing and distributing cocaine, using a telephone to facilitate the distribution of cocaine, and using firearms in relation to a drug trafficking crime. A seven week trial followed, after which thirteen defendants were convicted of the conspiracy (count one) and the firearms charge (count thirty-five); most were also convicted of various lesser charges. In this appeal, the thirteen appellants challenge their convictions and sentences.
 
 I.
 
 2
 During the investigation, Sterling Daniels[1] emerged as the leader of the conspiracy, buying cocaine to supply several houses that operated as retail outlets for the "hypes", i.e. drug addicts, in the local community. Michael Daniels, Sterling's brother, acted as Sterling's partner in some of the cocaine purchases and maintained his own drug house on Palmer Street. On New Year's Eve of 1989, Michael was shot in the legs and spent some time recuperating first in the hospital and then at Sterling's house. Anthony Gray, who lived in Illinois, was a longtime associate of Sterling's and contributed toward some major cocaine purchases. Bernard Goines worked with Sterling on some purchases, but mostly sold cocaine to customers Sterling directed to him. Anthony White and Jimmy Sloan began as partners running drug houses that were supplied with cocaine by Sterling, but after a falling out, they each maintained separate operations. Leonard Walker, Sterling's nephew, sold cocaine, but more importantly bought guns and arranged for a house rental to benefit the conspiracy. Lloyd Daniels, Sterling's brother, sold cocaine on occasion and provided transportation for Sterling and other conspirators. Debra Henry, an ex-girlfriend of Sterling's, arranged for Sterling to buy cocaine from suppliers she knew. Ellen Jeanette Moreland coordinated kilogram quantity purchases of cocaine from Chicago for Sterling and other conspirators. Danny Eppenger and Timothy Taylor sold cocaine for Michael from the Palmer Street drug house. Kenneth Smith sold cocaine supplied by Sterling.
 
 
 3
 The conspirators protected their drug houses by keeping weapons close at hand and also hidden throughout the house. Many guns were seized during searches and introduced at trial as evidence. In particular, police searches during 1988 and 1989 linked weapons purchased by Walker and others to houses identified at trial as being operated by White and Sloan. In March of 1989, Demetrius Lockett, one of Sterling's partners (Ex. 1376 T),[2] was shot to death. Christmas Davis, a former girlfriend of Sterling's, testified that Sterling had directed her to Lockett, whom she also knew, when she asked where she could get some cocaine. She found Lockett in a public housing apartment with Sterling's uncle. Lockett and the other two adults in the apartment were murdered shortly after she left.
 
 
 4
 In the summer of 1989, Sterling took Johnny Holliman into his home and taught him the drug business, for which Holliman repaid him by propositioning Sterling's live-in girlfriend and testifying against him at trial. Holliman initially answered the phone and watched the house while Sterling was out. Soon, however, Sterling had him delivering grocery bags full of cash to his suppliers. Holliman met Moreland through Sterling, when Moreland began supplying kilograms of cocaine to Sterling from her contacts in Chicago. After the arrest of one of Moreland's couriers, she engaged Hynes Dedrick to make the Milwaukee-Chicago run. He made several, which he testified about at the trial. Meanwhile, Holliman learned from Sterling how to cut cocaine (Tr. 1566)[3] and travelled to the Palmer Street drug house to perform this service several times. Tr. 1567-81. Holliman also got cocaine to be cut from Goines. Tr. 1577. After Lexandria Spinks, Sterling's girlfriend who was acquitted of all charges by the jury, told Sterling that Holliman had propositioned her, Holliman moved into the Palmer Street house and worked for Michael.
 
 
 5
 Moreland became less reliable as a source in the late summer of 1989. She received thousands of dollars in cash from Sterling, which she used to buy over two kilograms of cocaine according to the arrangement. Much to Sterling and Michael's chagrin, Moreland never delivered the cocaine or returned their money. Sloan and Goines also suffered a late summer setback. They were arrested after the taxicab in which they were riding was pulled over by the police who found ten bags of cocaine under the seat and three thousand dollars in cash on Goines.
 
 
 6
 On November 1, 1989, Sterling drove with Goines and Spinks to Kankakee, Illinois. Sterling and Spinks went to Gray's house where Spinks observed Sterling and another man cutting up a kilogram of cocaine. Later Spinks accepted Gray's offer to use his Cadillac, which she drove back to Chicago. Once there, she received instructions from Sterling that someone would be picking up the car and that there was cocaine in the trunk. Police stopped Spinks as she approached the car and, after she consented to a search, they found over a kilogram of cocaine in the trunk.
 
 
 7
 Kenneth Durrah made two purchases in the spring of 1989 on behalf of the DEA from unindicted coconspirators. The houses from which he made the purchases were subsequently linked to White. In January of 1990, Durrah contacted Sterling who put him in touch with Goines to buy cocaine. The subsequent sales were orchestrated by the police. Goines' house was searched in mid January. Police found some cutting agent and drug paraphernalia, but not the three ounces of cocaine hidden in the rain gutter. Walker drove Holliman to Goines' house to retrieve the drugs. The proceeds from those three ounces, part of which was sold from the Palmer Street house, went to Sterling and Goines. On January 12, the police raided the Palmer Street house where they found Eppenger hiding a scale and Taylor concealing a loaded weapon; the subsequent search turned up cocaine, cutting agent, and the phone numbers of various coconspirators.
 
 
 8
 Meanwhile Sterling was arranging to buy six ounces of cocaine from Henry. He and Gray drove to Lloyd's girlfriend's house. Lloyd drove them in his car to Henry's apartment. After Sterling left the car and entered the house, Lloyd and Gray were arrested. As Sterling exited the building, he was also arrested and was found to be carrying six ounces of cocaine and over two thousand dollars in cash. Sterling's arrest caused considerable uproar among his coconspirators, especially concerning the possibility of an informant, much of which was recorded over the telephone.
 
 
 9
 All of the defendants except Goines were arrested within approximately twenty-four hours or so of February 15, 1990, the day after the thirty-six count indictment was returned by the grand jury. Goines eluded the police until April of 1990, when they found him in possession of two loaded weapons and a copy of the indictment.
 
 II.
 
 10
 In a joint brief, all appellants challenge the sufficiency of evidence supporting their convictions of the conspiracy and firearms counts, and the jury instructions relating to those counts. They also argue that the trial court abused its discretion in evidentiary rulings permitting the admission of over fifty firearms and testimony about the murder of Demetrius Lockett and other acts of violence not directly tied to any defendant.
 
 A. Conspiracy
 
 11
 "[A] defendant has a heavy burden in challenging the sufficiency of the evidence with regard to his participation in a conspiracy." United States v. Gutierrez, 978 F.2d 1463, 1468 (7th Cir.1992) (citation omitted). We review the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government. Id. "If any rational jury could have found the defendant guilty beyond a reasonable doubt, the conviction will be affirmed." United States v. Curry, 977 F.2d 1042, 1053 (7th Cir.1992) (citation omitted).
 
 
 12
 Our review is not limited to direct evidence; "circumstantial evidence may be used to demonstrate both a conspiracy and the defendant's participation in the conspiracy." Gutierrez, 978 F.2d at 1468 (citing United States v. Diaz, 876 F.2d 1344, 1352 (7th Cir.1989)); accord United States v. Badger, 983 F.2d 1443, 1449 (7th Cir.1993); United States v. Durrive, 902 F.2d 1221, 1225 (7th Cir.1990) (circumstantial evidence will be accepted "as support, even sole support, for a conviction"). "In conducting the review, '[w]e will not reweigh the evidence or judge the credibility of witnesses' "; that is the jury's function. United States v. Campbell, 985 F.2d 341, 344 (7th Cir.1993) (quoting United States v. Van Wyhe, 965 F.2d 528, 531 (7th Cir.1992)). "[A] reviewing court, absent extraordinary circumstances, will defer to the jury's credibility findings." United States v. Troop, 890 F.2d 1393, 1397 (7th Cir.1989). The government must present "substantial evidence that [each] defendant was a conspirator." Campbell, 985 F.2d at 345.
 
 
 13
 As with many drug conspiracies, the structure among the defendant drug dealers defies a simple and straightforward description. As we have said before, "by their very nature, drug conspiracies are loosely-knit ensembles." United States v. Townsend, 924 F.2d 1385, 1391 (7th Cir.1991). This, however, does not mean that the government can meet its burden by proving mere knowledge, association, or presence, see Direct Sales Co. v. United States, 319 U.S. 703, 713, 63 S.Ct. 1265, 1270, 87 L.Ed. 1674 (1943); United States v. Troop, 890 F.2d at 1397 (7th Cir.1989), or a simple buyer-seller relationship. Townsend, 924 F.2d at 1394. The government must prove that each defendant knew of the agreement and intended to join it. Townsend, 924 F.2d at 1390.
 
 
 14
 Sterling's penchant for talking on the telephone aided the investigators who used a wiretap to piece together the rather sprawling network of associate drug dealers. In addition, DEA agents convinced Kenneth Durrah to infiltrate the conspiracy by purchasing cocaine for them. After the indictment, Johnny Holliman entered into a plea agreement and testified against the others at trial. Four other informants testified at trial: Hynes Dedrick, a sometime courier for Moreland, Sterling and Michael; Ricky Ray Coleman, who "worked the door," i.e. sold small quantities of cocaine to hypes in exchange for cash or guns, at Sloan's house; Richard Pounds, who worked the door for Sloan, White, and Michael; and Christmas Davis, who observed the workings of the conspiracy as the girlfriend of first White and then Sterling and as a customer/drug user.
 
 
 15
 The appellants base their challenges to the conspiracy conviction on the variance between the conspiracy alleged and the proof at trial. The importance of the distinction, discussed at greater length in Townsend, concerns the admissibility of alleged coconspirator statements, the spillover prejudice from a joint trial, and the liability for the substantive crimes of the entire conspiracy. See Townsend, 924 F.2d at 1388-89. Some defendants argue that, while the evidence may show that they conspired with others to distribute cocaine, they did not join the conspiracy described by the government and they were prejudiced by the joint trial. See Townsend, 924 F.2d at 1390 ("[T]o overturn a conspiracy conviction on the ground of variance, an appellant must show both that he did not conspire with each defendant and that he was prejudiced by being tried with defendants who were not his coconspirators.") (citing Fed.R.Crim.P. 52(a) ("Any variance ... which does not affect substantial rights shall be disregarded.")).
 
 
 16
 Most of the defendants cite the overwhelming evidence of drug trafficking and the number of guns seized as prejudicial to a rational determination by the jury that each defendant conspired to sell drugs with every other defendant. In addition, some argue that their relatively minor involvement makes their trial with the ringleaders prejudicial to their right to a fair trial. The level of participation is one factor to be considered in determining the possibility and degree of prejudice suffered by defendants who entered smaller, separate conspiracies. The government, however, may prosecute coconspirators of every level together, from the street dealer to those who run the show. Coconspirators do not have to have contact with, or even know, all of the other conspirators. In addition, they "need not be aware of all the details of the conspiracy in order to be a co-conspirator." United States v. Marshall, 985 F.2d 901, 905 (7th Cir.1993) (citation omitted).
 
 
 17
 The crime of conspiracy focuses on agreements, not membership in groups. Townsend, 924 F.2d at 1389 ("[T]he government doesn't have to prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged, not the group."). "[T]he liability of members of the distribution chain is predicated upon the notion that participants at different levels in the chain know that the success of those at each level hinges upon the success of the others and therefore cooperate for their mutual benefit." Id. at 1391. Minor members of a conspiracy run the risk of prosecution for every crime committed in furtherance of the conspiracy, even crimes in which they did not directly participate. As long as the crimes were within the scope of the conspiracy they joined, they will be held liable. This rule is fair because every member of the conspiracy benefits from the contribution of the others. The efficiency of a conspiracy lies partly in the cooperation of individuals completing different tasks, and it is the efficiency that makes the crime easier to commit and more likely to succeed.
 
 
 18
 On the other hand, a defendant may show that his rights were prejudiced if he is included in a lengthy complex trial of drug dealers with whom he did not conspire. In this case, the government presented the evidence of several informants and many hours of wiretapped phone conversations. Several appellants discuss arrangements to buy and sell cocaine and the whereabouts of various firearms in recorded phone conversations. In the face of this overwhelming evidence of drug trafficking, a few defendants were barely mentioned by the informants and in some cases the government presented relatively little evidence of their involvement. The danger that a jury might convict everyone whose name is associated with the core band of conspirators existed, although this jury acquitted one defendant of all charges and several other defendants of lesser charges. Especially for those appellants who did not make statements, taped or otherwise, that establish their involvement, the problems of spillover prejudice and otherwise inadmissible testimony present significant issues.
 
 
 19
 To determine that the evidence was sufficient to support the conspiracy convictions in this case, we must find that substantial evidence supports the jury's verdict that each appellant conspired with every other appellant in a single conspiracy, or that each appellant joined a conspiracy to distribute cocaine and the joint trial did not affect any defendant's substantial rights.
 
 1. Bernard "B." Goines
 
 20
 Only a sampling of the evidence offered against Goines is needed to show his participation in the drug conspiracy. Wiretapped phone conversations between Sterling and Bernard Goines establish Goines' agreement to sell cocaine in a partnership with Sterling. For example, in several conversations they talked about customers Sterling has directed, or will direct, to Goines:
 
 
 21
 Sterling: Did those people get in touch with you early?
 
 
 22
 Goines: Who?
 
 
 23
 Sterling: Them two that called me. Kenny, ...
 
 
 24
 Goines: Oh yeah.
 
 
 25
 Sterling: And a Coleman, Colby.
 
 
 26
 ....
 
 
 27
 Sterling: They calling for the one five o right?
 
 
 28
 Goines: .... No, he got a half.
 
 
 29
 Sterling: Oh, Colby?
 
 
 30
 Goines: No. One twenty five.
 
 
 31
 Sterling: That's all he bought?
 
 
 32
 Goines: Yeah.
 
 Ex. 1224 T. And the next day:
 
 33
 Sterling: I got somebody here that wants three.
 
 
 34
 Goines: Whole ones?
 
 
 35
 Sterling: Yeah.
 
 
 36
 Goines: Where he at?
 
 
 37
 Sterling: He right here.
 
 
 38
 ....
 
 
 39
 Sterling: Okay, well call Kenny, and where you want, what neighborhood you want him to come in?
 
 
 40
 Goines: A, shit. Might as well tell him to come over here too.
 
 
 41
 Ex. 1252 T. Goines also conspired with Johnny Holliman and the others working at the Palmer Street house. For example, after Sterling talked to Holliman (their conversation suggested that they both considered the cocaine that Goines possessed to belong to all of them), he called Goines to get some of the cocaine over to the Palmer Street house:
 
 
 42
 Goines: .... I had got rid of one, right?
 
 
 43
 Sterling: Yeah.
 
 
 44
 Goines: But I still got three other, let you get three man....
 
 
 45
 Sterling: Yeah, cause I ain't got nothing man........
 
 
 46
 Sterling: .... How do them three look, they good?
 
 
 47
 ....
 
 
 48
 Goines: You talking about does it have some strength or something?
 
 
 49
 Sterling: Yeah.
 
 
 50
 Goines: It still got a smell.
 
 
 51
 Sterling: Oh, well then, why don't you let Johnny take care of that man?
 
 
 52
 ....
 
 
 53
 Goines: You wanna come and get it?
 
 
 54
 Sterling: No.
 
 
 55
 Goines: Oh, you want Johnny to get it?
 
 
 56
 Sterling: Yeah.
 
 
 57
 Ex. 1404 T. The following conversation confirms that the Goines/Sterling conspiracy extended to Michael and those who worked for him:
 
 
 58
 Goines: .... We got like, you know how much we got altogether?
 
 
 59
 Sterling: How much?
 
 
 60
 Goines: About almost seven.
 
 
 61
 Sterling: .... Over Chicken now?
 
 
 62
 Goines: .... Yeah.
 
 
 63
 Ex. 1028 T. Goines and Sterling considered the total to include what Goines had and what was at the Palmer Street house.
 
 
 64
 Later, when Goines spoke to Spinks about the likelihood that Sterling had cocaine on him when he was arrested in connection with the six ounce deal, he implicated himself in the conspiracy with Sterling, Henry, and Gray:
 
 
 65
 Goines: Yeah. He had it on him.
 
 
 66
 Spinks: How you know?
 
 
 67
 Goines: Cause that's how we did it last time.
 
 
 68
 Ex. 1330 T. He also knew that Sterling had paid Henry the day before. ("He didn't have no ends. What ends? He gave her the ends yesterday.").
 
 
 69
 When Goines' house was searched, the police found cutting agent and plastic bags. Later he told Sterling about three ounces of cocaine hidden in the rain gutter; Holliman testified that he retrieved that cocaine and gave two ounces of it back to Goines. Tr. 1631-34. In addition, the government offered the testimony of Durrah who bought cocaine from Goines on two occasions in 1989, after being fixed up with him through Sterling. On January 4, 1990, Durrah engaged in a controlled buy from Goines, and the police took the money from Goines. He called Sterling to complain. Ex. 1054 T. He and Sterling planned to meet later that night and they both decided to bring their guns with them. Ex. 1056 T. Although Goines was widely thought to have turned informant by early 1990, see, e.g. Ex. 1374-76 T (Sterling and Goines discussed their suspicions about each other, related to their recent arrests); Ex. 1404 T (Sterling was still suspicious of Goines, as were Michael and Gray), he clearly participated in the wide-ranging conspiracy until, and even continuing after, that point.
 
 2. Ellen Jeanette Moreland
 
 70
 Johnny Holliman and Hynes Dedrick both testified about Moreland's agreement with Sterling to purchase kilograms of cocaine. Holliman testified that Sterling introduced him to Moreland in 1989. Tr. 1552. He testified that on three or four occasions Moreland picked up bags of cash from Sterling at his house, in order to buy kilograms of cocaine in Chicago. Tr. 1555. First Jeff McGee and then, after McGee's arrest, Hynes Dedrick made the Chicago to Milwaukee cocaine runs for Moreland and Sterling. Tr. 1556-61. Also he testified about Moreland's request for more money on one occasion and that he delivered an extra three thousand dollars to her. Tr. 1582-83. Sterling told Holliman that Moreland was supposed to use the money to buy two kilograms but she gave the cocaine to someone else. Tr. 1584.
 
 
 71
 Hynes Dedrick testified that in 1987 he began selling cocaine which Moreland "fronted," i.e. gave to him on credit. Tr. 964. He picked up about three and a half grams, known as an eightball, of cocaine and, after selling it, he paid Moreland approximately two hundred dollars. About six months into the arrangement, he began getting half kilogram quantities to sell. Tr. 967. In the spring of 1989, Moreland and Jeff McGee began buying cocaine from Moreland's source in Chicago for Sterling. Tr. 976. That summer, after McGee was arrested, Moreland asked Dedrick to make the Chicago to Milwaukee run. When Dedrick returned from Chicago, he contacted Sterling at a number supplied to him by Moreland. Tr. 982. He delivered three kilograms to Sterling. A few days later, Moreland paged Dedrick to set up another deal. Tr. 989. He picked up about forty-seven thousand dollars in a brown paper bag from Sterling's house, took it to Chicago, and bought two and one half kilograms of cocaine. Tr. 991.
 
 
 72
 Moreland contacted him about a possible problem with the cocaine, and he met Sterling at her house to discuss it. The cocaine had been recut; although Dedrick claimed not to have done it, he did not get paid for this run. Tr. 994-95. On the third run, Dedrick picked up twenty thousand dollars from an unindicted coconspirator and nineteen from Sterling. Again, Dedrick bought two and one half kilograms of cocaine in Chicago and brought it back to Sterling who recut it. At Sterling's direction, Dedrick took a package of four ounces for Moreland. Tr. 999. On the fourth and last time, in August of 1989, Dedrick picked up about thirty-seven thousand dollars from Sterling, bought two and one half kilograms in Chicago, and delivered it to Sterling. This time, Sterling fronted him three ounces, which Dedrick cut into five. Tr. 1003. He sold two before he was arrested for possession. When he asked Sterling to put up his bail money, Sterling told him he could not afford to because two kilograms which he had purchased had been taken from Moreland. Tr. 1005. In January of 1990, Dedrick talked to Sterling who told him that Moreland still was trying to repay him for the two kilograms. Tr. 1008.
 
 
 73
 Moreland's own statements during wiretapped phone calls reveal her conspiracy with Michael and Sterling. For example, she argues with Michael about his participation in a deal that resulted in a loss:
 
 
 74
 Moreland: .... Well, that day I got that money from Sterling. You ... was nowhere around.
 
 
 75
 Michael: I brought my money over here....
 
 
 76
 Ex. 1342 T. She and Michael argued several times about the lost two kilograms, but she maintained a relatively peaceful relationship with Sterling and called on January 5, 1990 to see how Michael was doing and to see if Sterling had any luck retrieving the missing cocaine. Ex. 1072 T.
 
 
 77
 The evidence against Moreland comes almost entirely from the incriminating testimony of the informants. These in-court statements, subjected to intense cross examination by her lawyer, present no hearsay problem. Moreover, the district judge instructed the jury to consider the testimony of informants "with caution and great care." Tr. 5507-08. A jury must make credibility decisions after hearing the testimony of witnesses; this jury clearly believed the informants, whose story was backed up by several wiretapped phone calls which reference the botched two kilogram deal. The evidence shows that, despite the trouble she faced after losing thousands of dollars of cocaine, she did not try to get away from the conspiracy. She continued to call Sterling and tried to make amends for the missing cocaine.
 
 
 78
 Moreland played a crucial role in the conspiracy to distribute cocaine, by supplying kilogram quantities from Chicago sources to Milwaukee. Strong evidence supports her cocaine distribution conspiracy with Sterling, Michael, Dedrick, McGee, and her Chicago suppliers. Even if the evidence did not support her participation in the broader conspiracy alleged in the indictment, Moreland suffered no prejudice from the joint trial. The evidence against her consisted mostly of informant testimony which she had the opportunity to challenge. As a major supplier of cocaine, she was directly responsible for a large portion of the total amount in the conspiracy. In addition, Dedrick testified that he carried a gun on at least one trip to collect the cocaine in Chicago. The use of weapons in a conspiracy to distribute drugs, especially at the actual transfer of cash and cocaine for which she was present at least twice, was reasonably foreseeable to her. Therefore, we will not reverse her conviction of count one.3. Sterling "Turk", "S" Daniels
 
 
 79
 The record is replete with evidence of Sterling's drug trafficking activities. The only real question is whether the evidence supported his conviction of this conspiracy with each of these defendants or only a smaller or different drug trafficking conspiracy. Sterling makes much of the fact that the government did not prove that he was the head of the BOS. Every government informant testified that Sterling was not in the BOS. The trial judge stated, at Sterling's sentencing, that the government had not proven that he headed the BOS. This, however, is not dispositive of the issue. Sterling can be convicted of conspiring to possess and distribute cocaine with each of these defendants without running the BOS. The BOS is not even mentioned in count one of the indictment. The evidence directly links Sterling with every other appellant in the agreement to distribute drugs. In fact, strong evidence suggests that Sterling conspired with many other drug dealers who were not indicted in this case.
 
 
 80
 Sterling held the key position in the conspiracy, working with suppliers and distributors, staying in touch with everyone and working out problems as they arose. Sterling directed customers to Goines (e.g. Tr. Durrah Excerpt 22[4]) and to the Palmer Street house. Tr. 1617. Holliman testified that a woman delivered guns to Sterling's house, which Holliman put in Sterling's bedroom. Tr. 1640. By talking almost incessantly on the telephone, Sterling exercised a kind of loose control over the conspiracy; he knew what was going on, who had what, who owed him money, who had been arrested and why. See, e.g. Ex. 1310 T (Sterling knew that Chicken's house, i.e. the Palmer Street house, had been raided, that there was no cocaine in the house ("They clean.") and that there were guns in the house ("They got some missiles in there."); Ex. 1190 T (Sterling talked about guns being seized from AD's house, Toucan's house and Marshall's house, and the police linking them to AD, Goines, and Sloan). He worried about the future of the conspiracy, about informants, and about his safety. See, e.g. Ex. 1024 T (Sterling lamented, "And then Chicken, Tony Wrong, and Junebug and AD [are in danger of being, or have already been, arrested]. And them all the key names in the posse so the rest of them be broke. So they can't go. So all the chiefs is gone.... AD, when AD go, his posse won't come in no more. Junebug go, his posse won't come. Chicken go, his posse will be broke."); Ex. 1028 T (Sterling tells Goines that AD is bringing him his "missile" after they discuss Chicken getting shot). He complained about mistakes by coconspirators but also tried to keep everyone content. See, e.g. Ex. 1068 T (Sterling was angry with Moreland for being in debt to him for two kilograms; he held her responsible since he gave her the money and she was the one who was supposed to go and get the cocaine); Ex. 1422 T (Sterling told Gray that he will get him some money soon to make up for Gray's part in the kilogram seized from Spinks by the police).
 
 
 81
 Sterling seemed well aware of the encroaching police presence during January of 1990. On a number of occasions, he told a caller that his phone was wiretapped. While he continued to set up cocaine deals, he blamed the increasing police interest on the number of weapons seized. For instance, Sterling and Goines discussed the guns at White's house:
 
 
 82
 Sterling: The reason the Feds is sweating everybody is because, them guns, you know what I'm talking about?
 
 
 83
 Goines: Yeah.
 
 
 84
 Sterling: They sweating everybody because them guns, them guns, that ah, them guns that ah, was at AD and them's house.
 
 
 85
 Goines: Yeah.
 
 
 86
 Sterling: You know what I'm talking about?Goines: Yeah.
 
 
 87
 Ex. 1376 T.
 
 
 88
 Sterling emerged as the head of the drug trafficking conspiracy during the investigation and during the trial. The evidence of his involvement at every level is overwhelming.
 
 4. Kenneth "Mookie", "Little Mook" Smith
 
 89
 The evidence against Kenneth Smith consisted mostly of Hynes Dedrick's testimony that he gave Smith four ounces of cocaine and that Smith was in debt to Sterling. Dedrick testified in detail about the first occasion on which he purchased three kilograms of cocaine at the direction of Moreland and Sterling. Tr. 977-88. When he returned from Chicago to Milwaukee, he called Sterling to deliver the cocaine. Tr. 982. He accompanied an unindicted coconspirator to a house on Fond du Lac where Sterling, Michael, and another person were waiting. Tr. 983. After he observed Sterling recut and repackage the cocaine, he delivered some of the packages at Sterling's request (Tr. 985-86), including a package to Smith. The package was "only four ounces" because Smith "was in debt." Tr. 986. He received about two thousand dollars from Smith which he delivered to Sterling. Tr. 987. On cross examination, Dedrick testified that Smith had called Sterling at the house while Sterling was recutting the cocaine, which prompted Sterling to set up the delivery down the street. Tr. 1178-79. That was Dedrick's only knowledge of Smith purchasing cocaine. Tr. 1184-85.
 
 
 90
 Richard Pounds testified that Smith came to a drug house door looking to buy an ounce, but Sloan was not there and Smith could not buy any cocaine. Tr. Pounds Excerpt 19. Later Pounds beat up Smith, over a dispute with Sloan, and stole some necklaces and rings from him. Tr. P. 230. Durrah testified that Smith came to a drug house, smoked some cocaine with Durrah and his cousin, and sold some to his cousin. Tr. Durrah Excerpt 38, 121-24. Johnny Holliman testified that Smith called Sterling's house and he gave Smith the number of the house on Fond du Lac, leading to the single Dedrick delivery. Tr. 1563. The government produced evidence that during the Palmer Street house search on January 12, 1990, police found a slip of paper bearing the name Mookie and a phone number. Sterling gave the same number to someone as Smith's number. Ex. 1022 T.
 
 
 91
 Smith's voice does not appear in any of the wiretapped conversations. The only other evidence concerning Smith consists of various conspirators discussing the possibility that he shot Michael or set Michael up somehow. See, e.g. Ex. 1144B T (Sterling told Sloan that he thinks "Little Mook" had something to do with "Chicken" getting shot); Ex. 1174 T (Sterling reiterated that Smith shot Michael). Because of this, other conversations concern retaliating against Smith. See, e.g. Ex. 1164 T (Sterling asked a friend to "smash" Smith both because he owes Sterling some money and because of his involvement with Michael's shooting. At the time, the friend is in jail, as are Sloan and Smith.); Ex. 1260 T (Michael and another man discuss "smashing Little Mook").
 
 
 92
 The evidence cannot support Smith's conviction of conspiracy. The essence of a conspiracy is agreement. Even giving all inferences to the government, no substantial evidence shows an agreement to distribute cocaine between Smith and anyone else. Rather, the evidence shows a mere buyer-seller relationship between Smith and Sterling. No one else sells cocaine to Smith; Smith sells cocaine only to a relative of an informant, a deal totally unrelated to the conspiracy alleged in this case. Smith failed in an attempt to buy cocaine from Sloan's house--hardly the efficiency or cooperation associated with a conspiracy. No evidence of trust or any mutual benefit supports an inference of conspiracy from the simple sale of cocaine from Sterling to Smith.
 
 5. Anthony "Illinois Tony", "IT" Gray
 
 93
 Gray implicates himself during wiretapped conversations with Sterling a number of times. For instance, he discussed the six ounce deal with Sterling, even while Sterling was clearing up the timing of it with Henry. Twice on January 12, 1990, Gray called Sterling to check on the progress of the deal:
 
 
 94
 Gray: You get it?
 
 
 95
 ....
 
 
 96
 Sterling: Not yet.
 
 
 97
 ....
 
 
 98
 Gray: I fixed my car.... I got my car.... About damn, that's, how long it's gonna take?
 
 
 99
 Sterling: It shouldn't be too much longer. I just called there.
 
 
 100
 Gray: The same dude gonna do it?
 
 
 101
 Sterling: Yeah, I know he gonna do it....
 
 
 102
 Ex. 1300 T. The information about the car being fixed is important because Gray drove Sterling to meet Lloyd, who drove them both to Henry's apartment that afternoon. Sterling later revealed, in a conversation with Goines, that the sole reason for switching cars was to evade detection by law enforcement officers. Ex. 1374-76 T.
 
 
 103
 Gray: What up "S"?
 
 
 104
 Sterling: Yeah, ah we still waiting.
 
 
 105
 ....
 
 
 106
 Gray: You didn't talk to her?
 
 
 107
 Sterling: Yeah, I talked to her. She went somewhere and paid some bills.
 
 
 108
 ....
 
 
 109
 Gray: How long?
 
 
 110
 Sterling: It shouldn't be too much longer.
 
 
 111
 Gray: God damn. I'm ready to go, man.
 
 
 112
 Ex. 1308 T. A few minutes later, as Sterling talks to Henry, he says, "What cha callit working with me. IT." Henry responds, "I know." Ex. 1314 T. While Sterling and Henry completed the transfer, Gray was arrested with Lloyd outside Henry's apartment.
 
 
 113
 In addition, Gray is linked to another cocaine purchase by Spinks' testimony. Spinks saw Sterling cutting up cocaine which had been delivered to Gray's house. She testified that Gray offered her his car to drive back to Chicago (Tr. 4569) and that she later learned from Sterling that the cocaine was in the trunk. Tr. 4576. The kilogram of cocaine that belonged to Sterling and Gray was seized by the police in Chicago during the search of the car. After Gray found out that Spinks gave a statement to the police, he called Sterling, complaining that throughout their conspiracy together there had been chronic problems. Ex. 1422 T ("And every time I come down there, man, look how much money I done lost, I've lost everything "S", coming up there with you man. God damn, everything, every time I, for the last, every time I fuck around, and do something big, I get fucked man, don't get nothing.... I have to come right back here broke...."). This exclamation followed his specific complaint about Spinks' statement which implicated both Gray and Sterling in the Kankakee deal. Sterling tried to placate Gray by telling him that when Sterling collected some money from people who owed him, he would give some to Gray. Gray's own statements during this phone call show his financial interest in that seized cocaine.
 
 
 114
 In a wiretapped phone conversation on January 18, 1990, Gray reveals the longstanding nature of his drug dealing relationship with Sterling. They discussed the old days, with Gray reminiscing that things ran more smoothly when Sterling exerted greater control over the conspiracy:
 
 
 115
 Gray: ... When you was you, you know, years ago, when you was handling it and taking care of things, things was perfect man. A motherfucker could just about count on you. Other niggers came in with their ideas and they plan, and they shifted a lot of shit, you know what I'm saying? They just weakened everything.
 
 
 116
 ....
 
 
 117
 Sterling: Well, ... the whole, that's all they talked to me about was, gun, you know what I mean?
 
 
 118
 Gray: Yeah.... All that shit was unnecessary, that was brought down by niggers from the penitentiary.
 
 
 119
 Sterling: Yeah.
 
 
 120
 ....
 
 
 121
 Gray: Cause I remember ... the first time, when I came up here and I seen all them niggers.
 
 
 122
 Sterling: Yeah.
 
 
 123
 Gray: You know, toting and carrying. I said, "What the fuck is this?"
 
 
 124
 Sterling: Yeah.
 
 
 125
 Gray: .... It wasn't nothing like this before.
 
 
 126
 Ex. 1424 T. By his own words, Gray conspired to distribute cocaine with Sterling for years. He contributed toward the purchase of the kilogram from Kankakee and the six ounces from Henry. Gray occasionally complained about the retail distributors and about the way Sterling let himself be pushed around by Michael, Spinks, and Goines. Still, the government does not have to prove fondness among coconspirators. Substantial evidence supports Gray's conviction of count one.
 
 6. Lloyd "D." Daniels
 
 127
 Evidence of Lloyd's involvement with the conspiracy came mostly from Durrah's testimony and the phone calls between Lloyd and his brother Sterling. Twice he spoke to Sterling regarding transportation to Henry's house to buy six ounces:
 
 
 128
 Lloyd: You ready? This D.
 
 
 129
 Sterling: Not yet.
 
 
 130
 ....
 
 
 131
 Sterling: .... I went by there, he had a, 600, but I have to get it down for her, you know, she wanted that for on top.
 
 
 132
 Lloyd: Okay. So ah, ah, it's going to be today though right?
 
 
 133
 Sterling: Yeah.
 
 
 134
 Lloyd: Okay, I'll call you back, 2-3 hours?
 
 
 135
 Sterling: Yeah, about 2 or 3, as soon as he, I got a few other things now.
 
 
 136
 Lloyd: Okay....
 
 
 137
 Ex. 1188 T.
 
 
 138
 Sterling: You going to be on point waiting?
 
 
 139
 Lloyd: Huh?
 
 
 140
 Sterling: You going to be, you going to be ready to move when I call?
 
 
 141
 Lloyd: Yeah.
 
 
 142
 Sterling: Okay, that's all I wanted to know.
 
 
 143
 ....
 
 
 144
 Lloyd: Okay, I'll be ready when you call.
 
 
 145
 Sterling: Okay, it could happen any minute. It might happen in five minutes, it might happen in an hour.
 
 
 146
 Lloyd: Okay, whatever.
 
 
 147
 Ex. 1296 T. That was the morning of January 12, the day of the Henry deal. Sterling showed up with Gray in Gray's car, whereupon Lloyd drove them both to Henry's. After Sterling's arrest, Lloyd spoke to Spinks about the fact that Sterling was "dirty," i.e. carrying cocaine. Ex. 1326 T. The jury quite reasonably rejected Lloyd's testimony that he thought Sterling was arranging a ride over to Henry's house in order to have sex with her.
 
 
 148
 Another time, Sterling directed Lloyd to help him safeguard Goines' house:
 
 
 149
 Sterling: No, hey, "D", run over here right quick, cause I gotta make run, I gotta bring somebody in the house over there, the police were in the house.
 
 
 150
 Lloyd: Over where?
 
 
 151
 Sterling: Over at Bernard's house.
 
 
 152
 Lloyd: Okay.
 
 
 153
 Sterling: I want to bring somebody over there, cause, you know, them hypes going to go in there, try to take something.
 
 
 154
 Lloyd: .... Okay, I'll be there.
 
 
 155
 Ex. 1274 T. Sterling and Lloyd discussed some details of the drug conspiracy, like the money dispute among Sterling, Michael, and Goines that developed in January of 1990. Ex. 1402 T. In addition, Durrah testified that Lloyd sold an eightball of cocaine to him on three or four occasions in 1989. Tr. Durrah Excerpt 38-39, 78-79. Although Lloyd denied it (Tr. 4893), the jury was free to accept the version of either man, according to their determination of the witnesses' credibility. On cross examination, Lloyd admitted that he told Sterling that he thought the informant among them was Goines. Tr. 4938.
 
 
 156
 Besides the tapes and the government witness testimony, the jury had additional information to weigh in determining Lloyd's guilt or innocence because he took the stand and tried to explain his presence outside Henry's house and his phone calls to Sterling. The jury, who believed and acquitted Lexandria Spinks, who also testified, convicted Lloyd, finding that he knew of and agreed to the conspiracy to purchase and distribute cocaine. Substantial evidence supports their determination.
 
 7. Anthony "A.D." White
 
 157
 White and Sloan were partners in drug trafficking at first and then maintained separate drug houses, according to the testimony of the informants. Tr. Pounds Excerpt 31, 36-38; Tr. Coleman Excerpt 8-9, 31-32. Pounds testified that White brought cocaine to the houses where he worked the door. Tr. P. 21. He testified that the cocaine was supplied through Sterling. Tr. P. 22-28. He further testified that in these drug houses, he saw handguns lying around, he knew White arranged for his sister to buy him a TEC-9, and that White carried a gun when he left the house. Tr. P. 49-51. Coleman testified that he bought a gun from one of the hypes and gave it to White. Tr. C. 27-28.
 
 
 158
 White talked to Sterling after the police seizure of some guns:
 
 
 159
 White: The Feds over at Toucan's house asking about you, LA, me.
 
 
 160
 ....
 
 
 161
 Sterling: Oh, what's at Toucan's house? Is that where that missile was at?
 
 
 162
 White: Yeah.
 
 
 163
 Sterling: Is that where them missiles was at?
 
 
 164
 White: Yeah.
 
 
 165
 Sterling: All them big missiles?
 
 
 166
 White: Yeah.
 
 
 167
 Sterling: I told you they were going to be tracked back there.
 
 
 168
 White: Yeah, they were asking him about where they came from.
 
 
 169
 Ex. 1268 T. On January 11, White and Michael discussed the deal between Hynes and Goines which led to their arrests. Both suspected that Hynes set up Goines and talked about Hynes' affiliation with Moreland who recently took money for two kilos and failed to deliver the cocaine. Ex. 1278 T.
 
 
 170
 The jury clearly believed the testimony of the informants who claimed to have "worked the door" in drug houses run by White and Sloan. White's own recorded words support their testimony regarding his involvement with weapons seized by the police and his affiliation with Sterling.
 
 8. Leonard "L.A." Walker
 
 171
 Walker bought several guns for the conspiracy; some of those guns were recovered from drug houses run by other defendants. He also provided a security deposit for one of the drug houses. In addition, Walker is recorded getting advice from his uncle Sterling about how he can evade identification during a handwriting exemplar for the government. He called Sterling because he was worried about the police seizure of some weapons he purchased:
 
 
 172
 Walker: .... You know that missile he got caught with?
 
 
 173
 Sterling: Yeah.
 
 
 174
 Walker: Yeah. They inquiring about that one and then remember that one I had got and then they said about some other ones that I had in, remember I bought? They asked our boy about it in "Chi."
 
 
 175
 Sterling: Yeah.
 
 
 176
 Walker: .... And they told him that they gonna try to get in touch with me for questioning.... They talking 'bout filling out some forms so they can try to get an I ... um, signature.
 
 
 177
 Sterling: Oh, signature?.... Oh well, you know how that goes. (Laughs) You know how that go.
 
 
 178
 ....
 
 
 179
 Sterling: They'll try and question you. And I'd just tell them, "No, I don't want to sign nothing.".... It ain't that serious right now.... Cause didn't nobody get smoked with them.
 
 
 180
 Walker: No, they're talking about seven that ... I bought.
 
 
 181
 Ex. 1046 T. A few minutes later Walker called back to clarify:Walker: It's just the signature shit. They have the signature, that's what it is.
 
 
 182
 Sterling: So how can they tell you wrote the signature?
 
 
 183
 Walker: They probably, you know, the experts and shit.
 
 
 184
 ....
 
 
 185
 Sterling: But you can write different, can't you?....
 
 
 186
 Walker: I'll just write with my other hand.
 
 
 187
 Sterling: Yeah. (Laughs) You can write with both hands?
 
 
 188
 Walker: I'm going to try.
 
 
 189
 Ex. 1048 T. Later, Walker discussed the whereabouts of several guns with Sterling, telling him that the police had the guns that Walker arranged for Sterling to get and that Sterling gave to others. Ex. 1388 T. Pounds testified that, besides purchasing guns, L.A. carried a .38 handgun, which Pounds observed on two or three occasions. Tr. Pounds Excerpt 56-57.
 
 
 190
 Walker called Spinks after Sterling was arrested to tell her that he had sent someone over to Sterling's house. Ex. 1330 T. Spinks testified that shortly thereafter Walker and some friends of his came to Sterling's house and removed a number of fur coats and leather coats, a watch, and pictures, including one of Sterling and Demetrius Lockett. Tr. 4697-99. This was in anticipation of a possible police raid on Sterling's house as a follow up to his arrest.
 
 
 191
 Not everyone in a drug trafficking conspiracy has to sell drugs. Walker provided a valuable service to the conspiracy; guns were almost as prevalent and as sought after as the cocaine. The jury heard substantial evidence of Walker's misguided willingness to contribute in any way to his uncle's success in distributing cocaine.
 
 9. Debra Henry
 
 192
 Most of the evidence against Henry stems from the six ounce sale to Sterling. Over the course of several days in January, Henry and Sterling discussed the quality of the cocaine her unnamed supplier had delivered and how much she would be able to get, but they did not negotiate the price between them.
 
 
 193
 Sterling: ... [S]o I'm going to catch "B" later on tonight and we going to do it like we say we going to do it.
 
 
 194
 Henry: Okay.
 
 
 195
 Sterling: Did you get a call from him yet?
 
 
 196
 ....
 
 
 197
 Henry: You see, it will be smooth too....
 
 
 198
 Ex. 1220 T. Additional evidence of their agreement comes from their speculation on future deals:
 
 
 199
 Henry: Yeah, cause then I ... then that way I can shoot for eight, ...
 
 
 200
 Sterling: Huh?
 
 
 201
 Henry: I said next time I can shoot for eight, next time ten.
 
 
 202
 Ex. 1160 T. They both wanted the best price from the supplier, but their partnership did not depend on the price:
 
 
 203
 Sterling: .... If I go depends on what I get, I'll pay you something on the bill.
 
 
 204
 Henry: Yeah.... You see, he wants seven.
 
 
 205
 Sterling: .... He wants seven, right?
 
 
 206
 Henry: .... That ain't bad though, is it?
 
 
 207
 Sterling: No, it ain't bad.
 
 
 208
 Henry: I'm trying to get him down to six....
 
 
 209
 Ex. 1140 T. The only difficulty between them is their frustration with each other at being unable to coordinate the timing of the deal.
 
 
 210
 Henry: Damn. This man sitting here waiting.
 
 
 211
 Sterling: He's still waiting?
 
 
 212
 ....
 
 
 213
 Henry: Yeah, he gone!
 
 
 214
 Sterling: He gone?
 
 
 215
 Henry: Ah huh, he said he wanted to bring that shit, but he said, if you ain't got what you supposed to have. You had all day. You supposed to do that.
 
 
 216
 Sterling: I know, I'm waiting to catch him.
 
 
 217
 Henry: That's fucked up. I told you he ain't going to be running back and forth.... So he ready to get the money, bring the shit.
 
 
 218
 ....
 
 
 219
 Henry: Get your shit together.
 
 
 220
 Sterling: Okay.
 
 
 221
 Henry: I thought you had some of the money already.
 
 
 222
 Sterling: .... [W]hatchacallit is holding the end, "B".
 
 
 223
 Ex. 1272 T. Later that night, after Sterling met the supplier and dropped off some money, Henry called to tell him how well the meeting went:
 
 
 224
 Henry: That motherfucker likes you, you know that.
 
 
 225
 Sterling: He do?
 
 
 226
 Henry: Yeah.... [H]e like you, he said he straight up, I said I told you, I said, he straight up....
 
 
 227
 ....
 
 
 228
 Sterling: That was him?
 
 
 229
 Henry: Yeah.
 
 
 230
 Sterling: He looked different.
 
 
 231
 Henry: No, that was.... Okay, he was in the other room.
 
 
 232
 Sterling: Oh, oh, oh, okay.
 
 
 233
 Henry: You know what I'm sayin.... You didn't see him.
 
 
 234
 ....
 
 
 235
 Sterling: That was his buddy?
 
 
 236
 Henry: Yes.
 
 
 237
 Ex. 1288 T.
 
 
 238
 The government presented substantial evidence of a cooperative relationship between Sterling and Henry, with no apparent negotiation of terms or opportunistic behavior. Henry knew that Sterling needed to gather money from several sources, including Goines and Gray, before he could buy the cocaine. On January 12, she called Sterling to say that she had it:
 
 
 239
 Sterling: Okay, what, what, he just left?
 
 
 240
 Henry: Yeah.
 
 
 241
 Sterling: They hard though?
 
 
 242
 ....
 
 
 243
 Henry: Yeah, he said it's great.
 
 
 244
 Sterling: Okay, with just six. Okay, cause I told whatchacallit, ten.
 
 
 245
 ....
 
 
 246
 Henry: If I can get the other dude to ... then see if I can get the ten for you tomorrow.
 
 
 247
 Sterling: No, I'll come and get that now. Cause somebody waitin. I'm on my way.
 
 
 248
 Ex. 1316 T. That afternoon, Sterling entered her apartment and exited in possession of six ounces of cocaine recovered during his arrest.
 
 
 249
 The evidence supports the jury's conclusion that this was not an arms length transaction or a mere buyer/seller relationship. Goines revealed a previous transaction in remarks to Spinks after Sterling's arrest. Henry was enthusiastic about future deals and considered it a good sign that her supplier felt comfortable about Sterling. The only reason Henry did not remain a source of supply for the conspiracy was Sterling's arrest and the indictment shortly afterward.
 
 10. Timothy Taylor
 
 250
 Taylor lived and worked in the Palmer Street house, Michael's drug house. Tr. 1589-90, 1593. He sold cocaine from the Palmer Street house from November of 1989 to February of 1990 when he was arrested there. As a worker at this house, he conspired to sell cocaine with Michael, Eppenger, and Holliman. When the house was raided by police, he called Sterling's house and talked to Goines. He described what happened, although Goines already knew or guessed most of it:
 
 
 251
 Goines: What happened man?
 
 
 252
 Taylor: Man, they ran up in there man.
 
 
 253
 Goines: Who.... it was the Feds, wasn't it? ...
 
 
 254
 Taylor: Yeah.
 
 
 255
 Goines: Who they was lookin for?
 
 
 256
 Taylor: Well, they asked about ... "S".
 
 
 257
 Goines: Yeah.
 
 
 258
 Taylor: Yeah. They didn't ask about Chicken though....
 
 
 259
 Goines: Ah, they got that bullshit, didn't they?
 
 
 260
 Taylor: Yeah, they got that motherfucker, they got the bullshit.
 
 
 261
 Ex. 1318 T. Next Taylor told Goines that they found a gun on him, to which Goines replied, "[T]he little one?" Taylor said yes and they discussed his luck in avoiding being held without bail. Then Goines put Sterling on the phone to discuss the raid with Taylor:
 
 
 262
 Sterling: Hey, when they came in, they asked for me?
 
 
 263
 Taylor: They did.
 
 
 264
 ....
 
 
 265
 Taylor: You know, and he said, I'm gonna make you a deal, you know, hey you know anybody named "Turk"?
 
 
 266
 Sterling: Yeah.
 
 
 267
 Taylor: I said, hell no, I don't know anybody named Turk ...
 
 
 268
 ....
 
 
 269
 Sterling: Yeah.
 
 
 270
 Ex. 1318 T. When Goines' house was raided, Sterling called the Palmer Street house, reached Taylor, and they agreed that Taylor might go to Goines' house to protect it from being ripped off by the hypes:
 
 
 271
 Sterling: Hey Tim man, you know they slamming "B" in the "B" house man?
 
 
 272
 Taylor: Yeah, I know.
 
 
 273
 Sterling: I know it but ... I want to go there and, you know, I don't want to talk on the phone, you know. Where you at?
 
 
 274
 Taylor: At home.
 
 
 275
 ....
 
 
 276
 Sterling: Yeah, what you doing?
 
 
 277
 Taylor: Not much.
 
 
 278
 ....
 
 
 279
 Sterling: Hey but I might a catch you man, if it's down to an emergency to lay there too.
 
 
 280
 Taylor: Alright.
 
 
 281
 Sterling: Cause you ain't got no warrants or nothing, ain't you? To lay there, so nobody can come in there, okay?
 
 
 282
 Taylor: Alright.
 
 
 283
 Ex. 1276 T. Michael was recorded setting up a drug deal with Taylor:
 
 
 284
 Michael: Little J on his way over there.
 
 
 285
 Taylor: Alright.
 
 
 286
 Michael: He want same thing, with it, the last he was short. Go on and give him a G extra, alright?
 
 
 287
 Taylor: Alright.
 
 
 288
 Ex. 1208 T. Substantial evidence supported Taylor's conviction of conspiring to distribute cocaine.
 
 11. Danny "Juice" Eppenger
 
 289
 Holliman and Pounds both identified Eppenger as a worker at the Palmer Street house and a member of Michael's posse. Tr. 1572, 1580, 1593; Tr. Pounds Excerpt 76. Eppenger lived at and sold cocaine from the Palmer Street house with Taylor and Holliman. Holliman testified that there were house guns at the Palmer Street house, used to "prevent trouble." Tr. 1628-30. For instance, a revolver was under the couch and a .22 was on the window sill. In addition, Eppenger was arrested at the Palmer Street house during the police raid. Cocaine, cutting agent, and related paraphernalia were seized from the house.
 
 
 290
 While Eppenger never incriminated himself in recorded telephone conversations, the government presented substantial evidence that he conspired to distribute cocaine. The jury accepted the testimony of the informants, supported by the direct evidence of his arrest during the raid.
 
 12. Michael "Chicken" Daniels
 
 291
 Michael arranged for Holliman, Eppenger, and Taylor to sell cocaine from the Palmer Street house. In January, Michael is taped twice setting up deals with Taylor, as discussed above. It was well known that the drug house on Palmer Street was Michael's house. See, e.g., Tr. 1568. He contributed to kilogram quantity purchases arranged by Sterling, including, by his own words, the deal gone awry with Moreland. See, e.g., Ex. 1342 T. Hynes Dedrick's testimony supports the inference that Michael was involved in the purchases from Chicago arranged by Moreland. Tr. 983.
 
 
 292
 In December of 1989, Sterling put someone named Pete in touch with Michael in order to trade a nine millimeter Uzi for a quarter. In the same conversation, Michael told Sterling that he gave "D" two grams which Sterling promised to replace. Ex. 1000 T. The next day, Sterling told Michael that he gave "D" the money. Ex. 1002 T.
 
 
 293
 Hynes Dedrick testified that, in January of 1990 while he was cooperating with the DEA, he met Sterling and Michael at Sterling's house to set up a three ounce controlled buy from Goines. Tr. 1009. Michael had a gun under the pillow on which he was lying.
 
 
 294
 Substantial evidence supports the jury's verdict that Michael conspired to distribute cocaine. His close association with Sterling gave him access to every level of the distribution process, from the major purchases to the street level sales to hypes.
 
 13. Jimmy "Junebug" Sloan
 
 295
 Sloan operated several drug houses, first in a partnership with White and then on his own. Pounds testified that he worked the door at houses run by Sloan. Tr. Pounds Excerpt 18-19. He testified that Sloan brought the cocaine to the houses where he worked. Tr. P. 21. Coleman also testified that he sold cocaine for Sloan. Tr. Coleman Excerpt 7. He testified that the majority of the money paid by hypes to those working the door at the drug houses went to A.D. and Junebug. Tr. C. 45. Sterling supplied the cocaine sold in the houses. Tr. P. 22-28. Dedrick testified that he delivered half a kilogram of cocaine to Sloan, at Sterling's direction. Tr. 987.
 
 
 296
 Sloan enjoyed a close and trusted relationship with Sterling. They discussed Sterling's appreciation that he could count on Sloan. Ex. 1044 T (Sterling--"That's one thing I can say about you, when you get your ends, you do me right."). When Sloan talked to Sterling after being arrested on January 11, 1990, they talked about an arrangement which would allow Sloan to stay in the conspiracy:
 
 
 297
 Sloan: Why don't you give my girl some ends man, she can put 'em in my account man, until we can start getting that money back man.
 
 
 298
 Sterling: Okay, what we gotta do, though, let's wait ... cause I got just enough to, you know, cause IT gave me eight, right?
 
 
 299
 Sloan: Yeah.
 
 
 300
 ....
 
 
 301
 Sloan: Man, I'm just going to go in here man, and call them shots from in there, in the jail spot man.
 
 
 302
 Sterling: Yeah.... After whatchacallit make that move, now if you want me to work, you know what I mean?
 
 
 303
 Sloan: Yeah.
 
 
 304
 Sterling: .... You want me to work, I can handle it, you know what I mean?
 
 
 305
 Sloan: Yeah, Regina.
 
 
 306
 Sterling: Huh?
 
 
 307
 Sloan: Yeah, through her.... Tell him to give you half of em, man, you know they got to give me about, about, about, about twenty-eight man.
 
 
 308
 Sterling: But I'm talking about if you want me to work, I'll work too, you know what I mean?
 
 
 309
 Sloan: Yeah.
 
 
 310
 Ex. 1268 T.
 
 
 311
 The government presented substantial evidence that Sloan participated in the drug trafficking conspiracy. His own words bear witness to his conspiracy with Sterling; the informants supplied additional information about his management of drug houses.
 
 
 312
 The jury's verdict that each appellant conspired to distribute drugs is supported by substantial evidence, except in the case of Kenneth Smith. There is also exculpatory evidence in the record. For example, Sterling told Goines he did not know anything about any guns (Ex. 1376 T); Gray told Sterling that he never offered Spinks the Cadillac (Ex. 1422 T). It is the jury's role to weigh the evidence and make credibility determinations. The government's evidence, reviewed with deference to the jury's findings, supports the conviction of twelve of the thirteen appellants of the count one conspiracy to distribute cocaine.
 
 
 313
 Moreover, the evidence supports the existence of the one large conspiracy described in count one. Not every coconspirator must participate in, or even know the details of, every aspect of the conspiracy. It is enough for the government to prove that each knew of the agreement to distribute cocaine and joined that agreement. In this case, the jury could have reasonably inferred that the appellants knew their success in selling cocaine depended on the success of the other coconspirators. For example, Henry knew that cocaine sales to Sterling depended on the cooperation of his capital-funding partners; Taylor knew that Sterling supplied the cocaine and Michael supplied some customers to the house where he worked. Between the wiretapped conversations and the government witness testimony, the jury had ample evidence of prolonged cooperation and a common purpose among the twelve appellants.
 
 
 314
 The appellants argue that the jury instructions on conspiracy were erroneous because the district court omitted from the proffered instruction the statement that only the words and acts of the particular defendant may be used to determine whether he joined the conspiracy. Instead the court instructed the jury, in part, that "[t]he government must prove beyond a reasonable doubt ... that the defendant was aware of the common purpose and was a willing participant." Tr. 5537-38. The defendants raised the issue of the conspiracy instruction's adequacy in a timely manner and submitted alternative instructions to the trial court. Tr. 5433-43.
 
 
 315
 The district court chose not to give the suggested instruction from United States v. Martinez de Ortiz, 907 F.2d 629, 635 (7th Cir.1990) (en banc), cert. denied, 498 U.S. 1029, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991). In that case, we stated our position on the proper use of coconspirator statements and the confusing effect of a pattern instruction which restricts the jury's consideration to the acts and statements of a particular defendant. Id. at 633-35. "As a matter of substantive law, membership in a conspiracy depends on the accused's own acts and words." United States v. Torres, 965 F.2d 303, 308 (7th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 237, 121 L.Ed.2d 172 (1992). Coconspirator statements determined to be admissible by the trial judge may be considered by the jury to decide "what the defendant did and said, or to help ... understand the defendant's acts and words." de Ortiz, 907 F.2d at 635. In addition, after a jury's determination that a defendant did join the conspiracy, the coconspirator statements may be considered "to decide any remaining questions." United States v. Nichols, 910 F.2d 419, 421 (7th Cir.1990).
 
 
 316
 The issue of excluding the "only the acts and statements" phrase from conspiracy jury instructions has been considered several times by this court since de Ortiz. While we have approved a district court's rejection of the former pattern instruction found inadequate by de Ortiz (see United States v. Rossy, 953 F.2d 321, 323 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 1240, 117 L.Ed.2d 473 (1992); United States v. Nichols, 910 F.2d 419, 421 (7th Cir.1990)), we have also expressed concern that trial judges provide sufficient guidance to the jury on this complex aspect of conspiracy law. See United States v. Collins, 966 F.2d 1214, 1224 (7th Cir.1992); United States v. Martinez de Ortiz, 907 F.2d at 635 (7th Cir.1990) ("A judge ought to help the jury understand the difference between the use of the evidence to decide whether the accused joined and the conditional relevance of the evidence for other purposes."). In this case, the government offered in its proposed instructions the paragraph from de Ortiz. Tr. 5436. The district court certainly did not have to accept this suggested explanation of the use of coconspirator statements. United States v. Collins, 966 F.2d 1214, 1224 (7th Cir.1992) ("[T]he precise wording of jury instructions is a matter left to the discretion of the district court.") The conspiracy instructions given, however, did not provide specific guidance on the important legal principle at stake.
 
 
 317
 "A court of review should 'proceed cautiously when asked to set aside a jury's verdict ... on the ground that the instructions contained erroneous or confusing passages.' " Timmerman v. Modern Industries, Inc., 960 F.2d 692, 696 (7th Cir.1992) (citations omitted). We review the instructions in their entirety, not in isolation, and we will not find reversible error absent prejudicial effect on the substantial rights of the parties. Vaughn v. Willis, 853 F.2d 1372, 1376 (7th Cir.1988). Our determination is based on a review of the record as a whole. Where we are convinced that the evidence in support of the verdict is so strong that, absent the erroneous instruction, the same verdict would be reached, the error is harmless. In this case, the combination of the "willing participant" instruction (Tr. 5538) with the preliminary instruction requiring "separate consideration to each defendant" (Tr. 5503) and the warning to consider the testimony of informants "with caution and great care" (Tr. 5507-08) indicated to the jury that they should focus on whether the defendants' acts and words showed a willingness to join the conspiracy. Moreover, the substantial evidence discussed above, much of it the defendants' own statements linking them to the conspiracy or other evidence not dependent on out-of-court coconspirator statements, convinces us that the jury would have reached the same verdict, had they received more complete guidance on the use of coconspirator statements. Therefore, the omission of a specific instruction on the proper use of coconspirator statements was a harmless error. See United States v. Collins, 966 F.2d 1214, 1224 (7th Cir.1992); United States v. Zapata, 871 F.2d 616, 622-23 (7th Cir.1989). District courts could avoid the need for this line of review by carefully instructing juries on this confusing but important issue, guided by the analysis in de Ortiz.
 
 B. Firearms
 
 318
 The appellants argue that, because the government failed to prove that each and every gun listed in the indictment was used or carried during and in relation to this conspiracy, the convictions under count thirty-five should be reversed. Count thirty-five of the indictment charged the defendants with "us[ing] and carry[ing] firearms, including the following," whereupon ten specific guns were listed with serial numbers, "during and in relation to a drug trafficking crime...." The appellants claim that by identifying particular firearms in the indictment, the government made these weapons an essential part of the charge. The government introduced eight of the ten listed guns and over forty other guns seized during various raids and arrests. The jury instructions referred to "a firearm" generally.
 
 
 319
 In United States v. Leichtnam, 948 F.2d 370, 379 (7th Cir.1991), relied upon heavily by the appellants, the court reversed a firearms conviction, holding that "the way the government chose to frame Leichtnam's indictment, it made the [specific gun described in the indictment] an essential part of the charge...." The indictment in that case charged the defendant with using and carrying "a firearm, to wit: a Mossberg rifle, Model 250CA with no serial number...." Id. at 374. Two other guns were introduced into evidence, and the jury instruction used the general phrase "a firearm." Because the court could not be sure which gun the jury considered in its finding of guilt, it reversed the conviction. Id. at 380.
 
 
 320
 This case is distinguishable. "To wit" means "namely." It is specific, exact, and limiting. Here, the indictment says "including." By its terms, this indictment is not limiting. The guns listed did not become essential to the charge, any more than including a list of named coconspirators makes proof of those specific people essential to the charge of conspiracy. In addition, in Griffin v. United States, --- U.S. ----, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), decided after Leichtnam, the Supreme Court held that a jury verdict is valid as long as sufficient evidence supports conviction for any one object of the offense. Because juries are well-equipped to weigh evidence, they can be trusted to distinguish factually supported from unsupported theories of the crime. Id. at 474. See also Composite Marine Propellers v. Van Der Woude, 962 F.2d 1263, 1265 (7th Cir.1992) ("The jury returned a general verdict, so if the evidence supports [the appropriation of] any one of [eight trade secrets], the verdict must be sustained."); Townsend, 924 F.2d at 1414 ("It is one thing to negate a verdict that, while supported by evidence, may have been based on an erroneous view of the law; it is another to do so merely on the chance--remote, it seems to us--that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.") (quoted in Griffin, --- U.S. ----, 112 S.Ct. at 474). Since the listed guns were not essential to the charge, the jury verdict will be sustained if sufficient evidence supports the use of any of the firearms.
 
 
 321
 A defendant may be found guilty of violating section 924(c) of Title 18 if a coconspirator used or carried a firearm during and in relation to the conspiracy, in furtherance of or as a natural, foreseeable consequence of the conspiracy, and if that defendant was a member of the conspiracy at the time. See 18 U.S.C. § 924(c); Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Therefore, as long as the government proved that one coconspirator used or carried one firearm in furtherance of the conspiracy, any defendant who was a member of the conspiracy at that time can be convicted of count thirty-five. The appellants argue that, because some of them joined the conspiracy after the seizure of some guns in evidence, they cannot be held liable for these weapons. In this case, the district court carefully instructed the jury that in order to find any defendant liable under a Pinkerton theory of count 35, it must find that defendant guilty of the conspiracy charged in count one and find beyond a reasonable doubt that, while that defendant was a member of the conspiracy, a coconspirator knowingly used or carried a firearm in relation to the conspiracy, in furtherance or as a natural consequence of that conspiracy. Tr. 5547-48.
 
 
 322
 The weapons admitted into evidence came from raids on drug houses or arrests of conspirators, or were purchased by conspirators. The wiretapped conversations among many conspirators show the widespread awareness of and concern about firearms, referred to commonly as missiles, used and possessed in the course of the conspiracy. The gun seized from Taylor during the Palmer Street house raid, for example, was carried in relation to and as a natural, foreseeable consequence of the conspiracy. If sufficient evidence proves that each appellant belonged to the conspiracy at that time, the convictions under section 924(c) are valid. Even the appellants who were relative latecomers to the conspiracy had joined by then and, as discussed individually above, none of the twelve appellants left the conspiracy before this raid. Although the evidence shows that Goines was under suspicion and that Moreland had to make amends, none of the appellants opted out of the conspiracy at any time before indictment.
 
 
 323
 The appellants argue that the jury instructions for count thirty-five impermissibly broadened the indictment, by permitting a finding of guilt based on using or carrying "a firearm" instead of the specific firearms listed in the indictment. "[T]hough an indictment may be narrowed, ... it may not be broadened, so as to present the ... jury with more or different offenses than the grand jury charged." United States v. Leichtnam, 948 F.2d 370, 377 (7th Cir.1991) (emphasis in original). Any expansion of the bases for conviction constitutes reversible error. Id. Under the appellants' theory, the instruction submitted to the jury combined with the admission of over fifty firearms at trial may have caused the jury to convict the defendants based on firearms outside the indictment. This argument fails because, as we have already stated, the firearms listed in the indictment were not essential to the charge in count thirty-five; the convictions could be legitimately based on any of the guns admitted into evidence.III.
 
 
 324
 Eleven[5] of the appellants argue that the trial court erred in computing the amount of cocaine attributable to them under the sentencing guidelines.[6] "The amount of drugs involved in a conspiracy is a factual determination by the sentencing court which we review for clear error only." United States v. Campbell, 985 F.2d 341 (7th Cir.1993) (citing United States v. Cochran, 955 F.2d 1116, 1124 (7th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992)); see also United States v. Banks, 964 F.2d 687, 692 (7th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 470, 121 L.Ed.2d 377 (1992). Each conspirator is responsible for the amount of cocaine he actually distributed and the amount involved in transactions reasonably foreseeable to him. The derivative nature of coconspirator liability "makes it imperative to determine the scope of the conspiratorial agreement each joined." United States v. Thompson, 944 F.2d 1331, 1344 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). "[T]he determination of the base offense level involves a separate inquiry that is made by the sentencing judge, for a general verdict does not establish with whom a defendant conspired or the quantity of drugs encompassed by the conspiracy." United States v. Edwards, 945 F.2d 1387, 1391 (7th Cir.1991), cert. denied sub nom, Martin v. United States, --- U.S. ----, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992).
 
 
 325
 A late entrant to the conspiracy may be held liable for the entire amount of drugs involved if he was aware, or should have been aware, of the amount involved in earlier transactions. This awareness of past quantities corresponds to the concept of reasonable foreseeability of future transaction amounts, and thus depends on the same sort of factual determination. The sentencing judge should state reasons why each individual defendant was aware of or reasonably foresaw the particular amount of drugs for which he will be held accountable, with reference to supportive evidence. Edwards, 945 F.2d at 1399 ("[T]he district judge should make clear that he has considered the evidence of the individual defendant's agreement to join a conspiracy of the scope alleged by the government."). In determining the amount of drugs, "the court may consider all relevant conduct that was part of the charged offense, regardless of whether that conduct was charged in the indictment." Banks, 964 F.2d at 692 (citing United States Guidelines Commission, Guidelines Manual, § 1B1.3 (Nov.1991)). "The government must prove by a preponderance of evidence the occurrence of the conduct that it asks the court to consider as relevant. The court makes credibility judgments concerning the facts of the government's case and the information provided in the presentence report." Id. (citations omitted).
 
 
 326
 Understandably, the district court tried to maximize the efficiency of the sentencing hearings. After a seven week trial, the court was well-versed in the evidence supporting the jury's verdict. The sentencing hearings began in January and dragged on into May, partly due to delays by some defendants and defense counsel. Still, district courts must resist the urge to accept summarily the quantity alleged by the government, even when thirteen defendants are subject to essentially the same proof. These appellants received sentences ranging from 181 months to 516 months. Especially when the sentencing guidelines call for imposing such heavy penalties, the district court must be precise in explaining the basis for specific factual findings, including any adjustments increasing or decreasing the base offense level and criminal history category.
 
 
 327
 On January 14 and 15, 1991, the district court held the first sentencing hearing, for Bernard Goines. First the district court noted the filing of a presentence report, objections filed by Goines, a response by the government, and further objections filed by Goines. At Goines' request, the court adjourned for twenty minutes to allow the probation officer to interview a family member and include updated information in its report. Sent. Tr. 10. The court considered the additional remarks and then adopted the factual findings from the presentence report and the January 8, 1991 addendum to the report, including the findings of the quantity of drugs involved in the conspiracy. Sent. Tr. 13-14. The offense level was thirty-six, with a criminal history category of five. Then the court gave Goines' counsel time to argue the preliminary guideline computation. Sent. Tr. 16.
 
 
 328
 The court heard argument regarding Goines' acceptance of responsibility, before concluding that Goines was not eligible for it. In deciding, the court specifically considered 1) the statement given to the agents which was "selective" particularly in his degree of involvement, 2) his fugitive status following indictment, 3) the lack of voluntary withdrawal by him from the criminal activity, 4) the two guns found in his possession at the time of his arrest, and 5) the cocaine hidden in the gutter and retrieved after his house was searched. Furthermore, the court stated that while "Mr. Goines personally may not have participated in each and every [incident related to the conspiracy], ... he was more than well aware of what the reality of the drug culture and drug dealing was in the inner city for a very protracted period of time and didn't do a thing to assist the law enforcement other than giving this ... rather self-serving statement on the occasion of his arrest." Sent. Tr. 23.
 
 
 329
 Next the court heard argument regarding Goines' role in the offense, before adopting the recommendation of the probation department for a two level enhancement. Goines' role of growing assertiveness in decisions of delivery and direction and his increasing importance to Sterling, despite some distrust, led the court to apply the departure. Referring to notes taken during the course of the trial, the court found that, although Goines played a lesser role originally, his actions and statements toward the end of the conspiracy warranted the enhancement. Sent. Tr. 26. This brought the base offense level from thirty-four to thirty-six.
 
 
 330
 Because the government sought to use a statement given to agents by Goines and Goines challenged its voluntariness, the court conducted an evidentiary hearing before proceeding. Sent. Tr. 36-47, 49-57. Next, Goines called a detective to the stand, to refute additional matters raised in the government's submission about his involvement in two murders; this detective was also questioned by the prosecutor and the district judge. Sent. Tr. 58-67. At this point, before adjourning until the next morning, the court warned Goines that it considered his earlier testimony under oath to be a complete fabrication and suggested that he "think about" that overnight. Sent. Tr. 68-69.
 
 
 331
 The next morning, the court entertained argument on an obstruction of justice departure, before departing upward two levels to an offense level of thirty-eight. Sent. Tr. 73-80. The departure was based on Goines' perjurious testimony the preceding day, contradicted by the previous statement he gave and the evidence presented at trial. Next, the court heard argument on the appropriate sentence within the guideline computation. Sent. Tr. 82-95. Before imposing the sentence of 516 months, the court referred to outstanding charges of criminal conduct, Goines' utter lack of remorse, and Goines' awareness of two additional murders outside the trial and possible participation in them. Sent. Tr. 95-104. In addition, the court specifically found that the statement Goines gave to the agents after his arrest was voluntary.
 
 
 332
 While it seems almost absurd, after such a complete and extensive hearing, to require more from the sentencing judge, we note that the court adopted wholesale the government's submission on the relevant quantity of cocaine for sentencing. By setting the base offense level in relation to the amount of cocaine involved in the conspiracy, the court failed to make a specific finding of the quantity reasonably foreseeable to Goines. Besides the remark that the amount included drugs "which Mr. Goines had no idea existed" as opposed to those over which he had direct control (Sent. Tr. 16), Goines' counsel made no specific arguments refuting the amount calculated by the government. Neither the prosecutor nor defense counsel informed the court of the need to make an individual finding of awareness or foreseeability before determining the relevant amount of cocaine.
 
 
 333
 In several of the thirteen sentencing hearings, the district judge, sometimes prompted by the defense counsel's insistence, made sufficiently specific findings of foreseeability to support the imposition of the base offense level thirty-four for over fifteen but under fifty kilograms. For example, at Ellen Jeanette Moreland's hearing, defense counsel and the prosecutor addressed the relevant quantity, point by point. Moreland Sent. Tr. 19-22, 23-25, 25-27. The court found 15 kilograms "quite conservative," after hearing the arguments. Moreland Sent. Tr. 27-29, 31. The court also made specific findings before sentencing Lloyd Daniels (Lloyd Sent. Tr. 18-21), Timothy Taylor (Taylor Sent. Tr. 41-45), and Michael Daniels (Michael Sent. Tr. 21-22).
 
 
 334
 Furthermore, Anthony Gray, Debra Henry, and Danny Eppenger failed to preserve the issue of the proper quantity determination because they did not object to the determination at the time of sentencing. Therefore, we review the decision to hold fifteen kilograms attributable to them for plain error. United States v. Livingston, 936 F.2d 333 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 884, 116 L.Ed.2d 787 (1991). The evidence supports both their direct involvement with substantial quantities of cocaine and also the conclusion that each was aware of, or reasonably foresaw, a minimum of fifteen kilograms involved in the conspiracy. Therefore, we affirm their sentences.
 
 
 335
 We are reluctant to vacate and remand the sentences of the other four appellants, especially because the district court has already devoted considerable time to this case, including many thoughtful remarks and credibility findings during the individual sentencing hearings. The law, however, requires specific factual findings by the sentencing judge about the scope of each defendant's agreement in a conspiracy case, where the crucial element in determining the proper base offense level is the reasonable foreseeability, or reasonable awareness, of the quantity of drugs. In this case, the district court adopted findings about the amount of cocaine involved in the entire conspiracy, without making the further determination of the scope of each defendant's agreement. Therefore, the sentences of Goines, White, Walker, and Sloan are vacated and remanded for resentencing in accordance with the requirements of Thompson, Edwards, and this opinion.[7]
 
 
 336
 Three appellants raise additional claims regarding the enhancements of their sentences. A sentencing finding of an aggravated role is reviewed under the clearly erroneous standard. United States v. Skinner, 986 F.2d 1091, 1095-96 (7th Cir.1993); United States v. Ramos, 932 F.2d 611, 617-18 (7th Cir.1991). "Under the Guidelines, those who play an aggravating role in the offense are to receive sentences that reflect their greater contributions to the illegal scheme." United States v. Brown, 944 F.2d 1377, 1381 (7th Cir.1991). The district court is in the best position to determine each defendant's relative culpability. United States v. Tetzlaff, 896 F.2d 1071 (7th Cir.1990).
 
 
 337
 Moreland argues that the district court erred in increasing her base offense level for her role as a manager or supervisor. The relevant guideline provides for a three level upward departure "[i]f the defendant was a manager or supervisor ... and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Moreland contends that the evidence showed that she only directed two people, McGee and Dedrick. The guideline, however, does not require that the defendant controlled five or more people. Application is proper if the defendant was a manager, i.e. exercised some control over others involved in the criminal scheme, and the scheme involved five or more people. United States v. McGuire, 957 F.2d 310, 316-17 (7th Cir.1992). In this case, Moreland managed McGee and Dedrick's drug running between Chicago and Milwaukee. Drawing the kilogram purchasing conspiracy as narrowly as possible, Sterling, Michael, and the Chicago supplier were also involved; counting Moreland, that makes a minimum of six participants. Therefore, there is no error in increasing Moreland's sentence.
 
 
 338
 Sterling claims that the district court committed clear error in determining both his base offense level and his criminal history category. The district court added a two level increase under the second application note in the commentary to Sentencing Guideline 2D1.5, which provides for an upward departure "[i]f as part of the enterprise the defendant sanctioned the use of violence, or if the number of persons managed by the defendant was extremely large." U.S.S.G. § 2D1.5, Commentary Note 2. The court found, at sentencing, that, while Sterling may not have been "out on the street riding around in the van doing the drive-by shootings," he condoned the violence engaged in by coconspirators. Sterling Sent. Tr. 66, 72-73. The court also referenced the plan for Kenneth Smith's assault. Additionally, the court found that Sterling managed "somewhere in between five and ... fifty" people. Sterling Sent. Tr. 74. The record is this case supports the court's findings that Sterling approved of, or even incited, violence in the conspiracy. See, e.g. Ex. 1164 T; Ex. 1298 T. As the leader of the coconspirators, he clearly supervised at least ten, and probably many more, people.
 
 
 339
 The court also increased Sterling's criminal history category from I to III, based on the inadequate representation of his criminal history. See U.S.S.G. § 4A1.3. The court considered Sterling's prior conviction for drug distribution, and the fact that he received a suspended sentence in that case,[8] before increasing the criminal history category. Sterling Sent. Tr. 74-77. Sterling's prior conviction of a felony narcotics offense provides an adequate basis for an upward departure in his criminal history category. See United States v. Schmude, 901 F.2d 555, 559 (7th Cir.1990) ("Rationally, if a defendant has been convicted of the same offense more than once, he has demonstrated the need for greater sanctions to deter him from committing that same crime again...."). The degree of the departure is also reasonable; if Sterling's sentence for the previous conviction had not been stayed, he would have received a criminal history category of III, for a prior sentence of imprisonment exceeding one year and one month. U.S.S.G. § 4A1.1(a). The court correctly used "as a reference in determining degree of departure, the Guideline range for the Criminal History Category that most closely resembles defendant's criminal history." Schmude, 901 F.2d at 559. The enhancement, therefore, was not in error.
 
 
 340
 The district court increased Michael's base offense level by four points based on its finding that he was a leader or organizer. The relevant guideline provides for a four level increase "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Among the factors to be considered, according to the comment to the guideline, are "the nature of participation in the commission of the offense, the recruitment of accomplices, ... and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 Commentary Note 3.
 
 
 341
 In applying the enhancement, the court specifically noted that Michael "ruled with the proverbial iron fist through intimidation, considerable divergence in personality from his brother Sterling." Michael Sent. Tr. 37-38. The court also found that, "were it not for those whom he recruited and worked with in distributing cocaine ..., and the organizational networking, whether it was through the BOS or others," the conspiracy would not have been the same. Michael Sent. Tr. 39. This comports with the picture of Michael that emerged during the trial, as the main BOS link to the conspiracy and as one who recruited members and ran his own drug house. Clearly, as determined above, the criminal activity in this case involved more than five people. Therefore, the four level enhancement to his sentence was not error.
 
 IV.
 
 342
 Among the appellants' remaining arguments, only a few raise issues that merit discussion.
 
 A. Ineffective Assistance of Counsel
 
 343
 Appellants Goines, Walker, Michael, and Sloan claim to have received ineffective assistance of counsel. To prevail on an ineffective assistance of counsel claim, each defendant must satisfy both prongs of the test identified in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See United States v. Booker, 981 F.2d 289, 292 (7th Cir.1992); Velarde v. United States, 972 F.2d 826, 828 (7th Cir.1992). The defendant must show that his attorney's performance was constitutionally deficient and that the deficiency altered the outcome of the case. Velarde, 972 F.2d at 827-28. Because defense counsel are presumed to be effective, the defendants must overcome a heavy burden to show that their counsel fell below an objective standard of reasonableness and that they suffered actual prejudice as a result. Booker, at 292-94.
 
 
 344
 Goines, in a pro se brief, and Sloan argue that their trial counsel failed to meet an objective standard of reasonableness, because they did not move to suppress evidence of the August 22, 1989 taxi cab search. As the evidence was offered at trial, both lawyers objected but the court overruled the objections as untimely and on the merits. Tr. 2054, 2056-61. Detective Fred Krenzke testified that the police stopped the cab for speeding and searched the backseat because they observed furtive movement by the passengers. Tr. 2054-56. The search yielded ten bags of cocaine hidden beneath the seat and over one thousand dollars in cash carried by Goines. Tr. 2062-66. The officer testified that he gave the cab driver a verbal warning. Tr. 2072. K.C. Bentley, the cab driver, testified that he might have been exceeding the speed limit (Tr. 5187, 5199) but that the police did not issue a warning or a ticket after the stop. Tr. 5187-88.
 
 
 345
 The failure to bring a motion to suppress the fruits of this search does not make the appellants' counsel performance deficient. First, the government, in its proffer, demonstrated evidence of probable cause to search the cab. The court considered this evidence in overruling defense counsels' objections. The appellants have not offered much support for the proposition that any motion to suppress would have been granted. Second, the lawyers vigorously cross-examined the government's witness and offered rebuttal testimony by the cab driver. Third, this search did not concern an essential element of the government's proof. Cf. Rodriguez v. Young, 906 F.2d 1153 (7th Cir.1990) (failure to move to suppress the only identification of the defendant as the murderer was objectively unreasonable), cert. denied, 498 U.S. 1035, 111 S.Ct. 698, 112 L.Ed.2d 688 (1991). The evidence seized was only a fraction of the evidence linking both Goines and Sloan to the drug trafficking conspiracy. Failure to bring the motion was not objectively unreasonable. Furthermore, neither appellant can satisfy the prejudice prong of the Strickland test.
 
 
 346
 Goines and Sloan also argue that the late appointment of their lawyers denied them counsel during the critical pretrial phase of the proceeding. Counsel was appointed for Goines on May 3, 1990, two weeks after he was arrested. Sloan indicated at his arraignment that he would retain private counsel. In March and April, the Clerk of the Court sent Sloan three letters informing him that no one had filed an appearance on his behalf and requesting the financial information needed if he wanted appointed counsel. Sloan never responded to these letters. The government requested a hearing to find out if Sloan chose to proceed pro se. At the hearing on May 3, Sloan provided the financial information and counsel was appointed for him the next day. The appellants' own actions, whether by evading law enforcement for two months after the indictment or by making a late decision to accept appointed counsel, prevented the possibility of appointment of counsel at an earlier date. See United States v. Moya-Gomez, 860 F.2d 706, 742 (7th Cir.1988) (no abuse of discretion for court to deny continuance where defendant selects new counsel shortly before trial date). Moreover, both lawyers had over two months to prepare for trial. The appellants have not shown that the late appointment rendered their counsel's performance deficient or that they were prejudiced.
 
 
 347
 Michael Daniels bases his ineffective assistance claim primarily on his lack of contact with his counsel. He conferred with his lawyer for the first time one week before the trial began. At a hearing to consider Michael's pro se motion to substitute counsel, his lawyer explained several logistical difficulties in contacting Michael (and expressed doubt that Michael could help in his own defense). R. of Hearing 9-13. The court denied the motion, noting that Michael's lawyer had worked on the case for months and that it was too late for anyone else to prepare for trial. At trial, Michael's counsel subjected the government witnesses to vigorous cross examination, as the district court noted in its denial of Michael's post-trial motion. Michael Sent. Tr. 3. There is no evidence of any specific errors by Michael's counsel which render his performance deficient. In addition, Michael cannot satisfy the prejudice prong of the Strickland test. The evidence against him, including the wiretapped recordings of his own words, was overwhelming. He has not demonstrated that any deficiency in his representation altered the outcome of the case.
 
 
 348
 Walker argues that he received ineffective assistance of counsel because his lawyer failed to present his best defense, in the form of a lesser-included offense instruction. Relatedly, Walker argues that his counsel's decision not to have him testify was unreasonable. Walker's counsel indicated to the court that, although his client had planned to testify, conceding his guilt on the gun charges but not on the conspiracy, he felt he could not do so in a joint trial. Tr. 5269. The court had previously denied Walker's motion for severance. Walker argues that his lawyer took an "all or nothing" approach, instead of allowing the jury to convict him of lesser charges.
 
 
 349
 First, we note that Walker has not shown how he could have prevailed on a motion to instruct the jury on a lesser included offense, especially since an illegal purchase of weapons is not a lesser included offense of a drug trafficking conspiracy. More importantly, we will not second guess defense counsel's trial strategy if it has a rational basis. Booker, at 295. Walker's counsel heard the wiretap recordings of his client's own words and observed the blistering cross examination of Lloyd Daniels. The decision not to put Walker on the stand certainly had a rational basis. Besides, Walker told the court himself that he did not wish to testify. Therefore, Walker has not shown that his counsel's performance was deficient.B. Severance Motions
 
 
 350
 Five appellants, Walker, Eppenger, Gray, Henry and Michael, argue that they were prejudiced by the court's refusal to sever the trial. Initially, we note that " 'severe prejudice is required for an order of severance and the trial judge's refusal to sever is rarely reversed.' " United States v. Curry, 977 F.2d at 1050 (quoting United States v. Velasquez, 772 F.2d 1348, 1352 (7th Cir.), cert. denied, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1985)). We review the court's decision for an abuse of discretion. United States v. McAnderson, 914 F.2d 934, 948 (7th Cir.1990). In judging a motion for severance, the district court must balance the benefit of judicial efficiency in a joint trial with the risk of prejudice to a defendant. Id. at 949. We presume that a jury will follow the instructions given to it and consider each defendant separately.
 
 
 351
 Over the course of seven weeks, the government presented evidence to the jury in the form of many hours of wiretapped recordings, many weapons, and over a dozen witnesses, including several informants. The indictment charged many different crimes by different combinations of defendants. Moreover, we recognize that some defendants played relatively minor roles in the conspiracy, and there was a risk that the jury would, in a flood of zeal, convict everyone of everything. That, however, did not happen in this case. The jury acquitted one defendant of all charges. Perhaps more remarkably, it acquitted some defendants of a particular count but convicted the others charged in the same count. The verdict handed down in this case proved that the jury contemplated each count and each defendant separately, adopting some evidence and discarding other evidence. Not surprisingly, the appellants cannot show prejudice by pointing out unsupported convictions. The denial of the motions for severance was not an abuse of discretion.
 
 
 352
 Gray raises an additional, more specific claim of prejudice. He argues that the court's failure to sever his case from Lexandria Spinks' case prejudiced him because they presented mutually antagonistic defenses. As the Supreme Court has recently ruled, "[m]utually antagonistic defenses are not prejudicial per se." Zafiro v. United States, --- U.S. ----, ----, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993). Simple blame-shifting does not necessarily "prevent a jury from making a reliable judgment about guilt or innocence." Id. Gray has not shown that his defense was irreconcilable with Spinks' defense to the extent that to acquit one would preclude the acquittal of the other.
 
 
 353
 More importantly, Gray has not even shown that their defenses were antagonistic. The jury could have believed Spinks' testimony that she did not know about the cocaine in the trunk of the Cadillac, and also believed that Gray did not put the cocaine in the car and did not know it was there. Spinks testified only that Gray offered her the car, Sterling gave her the keys, and Sterling called her later to tell her that cocaine was in the trunk. From there it was up to the jury to decide if the cocaine belonged to and was controlled by Sterling alone, Sterling and Gray, or Sterling, Gray, and Spinks. The jury chose to believe that Gray knew about the cocaine, not an unreasonable decision considering the other evidence of Gray's involvement in the conspiracy. Therefore, the district court did not abuse its discretion by denying Gray's motion for severance based on Spinks' testimony and defense.
 
 C. Competency Question
 
 354
 Three days prior to the start of the trial, counsel for Michael Daniels filed a motion requesting a competency examination for Michael pursuant to 18 U.S.C. § 4241(a). "[I]f there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense," then a district court must order a competency hearing. 18 U.S.C. § 4241(a); United States v. Garrett, 903 F.2d 1105, 1115-16 (7th Cir.), cert. denied, 498 U.S. 905, 111 S.Ct. 272, 112 L.Ed.2d 227 (1990). We review factual findings by the district court for clear error. Id. We review the decision not to hold a competency hearing for an abuse of discretion. Chichakly v. United States, 926 F.2d 624, 633 (7th Cir.1991).
 
 
 355
 In support of his motion, Michael's counsel stated that during their conference, Michael had behaved in an agitated and unhelpful manner. The district court noted that Michael's comments to the court and his written submissions to the court in the form of several pro se motions seemed very lucid, belying any challenge to his competency. R. of Hearing at 5-6, 13. The court declined to order a hearing at the time but advised Michael and his counsel that if they presented "something more salient in the way of factual information," that it would reconsider. Neither Michael nor his counsel ever presented any further evidence or renewed the issue throughout the trial. In a post trial motion, Michael claimed that the failure to order a hearing was error but presented no evidentiary support. The meager evidence presented at the eleventh hour to the district court did not create reasonable cause to believe that Michael suffered from any mental defect contemplated by the statute. Therefore, we find no abuse of discretion in the district court's decision not to order a competency hearing or examination.
 
 D. Evidentiary Errors
 
 356
 In their joint brief, the appellants complain about the admission of evidence concerning acts of violence and the admission of over fifty firearms. We review a district court's decision to admit evidence for an abuse of discretion. See Troop, 890 F.2d at 1401. The weapons introduced had been seized by police during house raids or arrests. Government witnesses identified the houses from which many of the guns were taken as drug houses associated with the conspiracy. The government alleged that other weapons had been purchased by or for coconspirators. There was no abuse of discretion in admitting the weapons at trial.
 
 
 357
 Nor did the district court abuse its discretion in admitting the evidence of violence, including the murder of Demetrius Lockett,[9] against the coconspirators. According to Sterling's own characterization during a wiretapped phone call, Lockett was one of Sterling's partners in the drug trade. Ex. 1376 T. Christmas Davis testified that Sterling directed her to Lockett when she called him looking for cocaine, much in the way that Sterling directed others to Goines after Lockett's death. The other evidence was similarly tied to coconspirators and showed concerted action among them. It further illustrated for the jury the nature of the conspiracy and the reason for the number of weapons kept by the conspirators. The district court did not abuse its discretion in its evidentiary rulings.
 
 V.
 
 358
 The convictions and sentences of Ellen J. Moreland, Sterling Daniels, Anthony Gray, Lloyd Daniels, Debra Henry, Timothy Taylor, Danny Eppenger, and Michael Daniels are AFFIRMED. The convictions of Bernard Goines, Anthony White, Leonard Walker, and Jimmy Sloan are AFFIRMED, but their sentences are VACATED and their cases REMANDED to the trial court for resentencing. The conviction of Kenneth Smith is REVERSED.
 
 
 
 [1]
 Throughout the opinion we will refer to Sterling, Michael, and Lloyd Daniels by their first names, after the first time they are mentioned. We will refer to all other appellants by their last names, except when we are quoting the record
 
 
 [2]
 References to telephone wiretap transcript exhibits will be designated as they were marked at trial, Ex. (number) T
 
 
 [3]
 References to the trial transcript will be designated "Tr." followed by the page number
 
 
 [4]
 Initial references to excerpted portions of the trial record, consisting of informant testimony, will be designated by "Tr.," the last name of the witness, "Excerpt" and the page number. Thereafter, the reference will include only "Tr.," the witness' initial, and the page number
 
 
 [5]
 We do not consider any further arguments regarding Kenneth Smith because his conspiracy conviction has been reversed and his related conviction under a Pinkerton theory of the firearms offense is also reversed
 
 
 [6]
 Sterling Daniels does not contest the amount of cocaine used to compute his sentence. He raises other sentencing issues which will be addressed later
 
 
 [7]
 Because the district court made specific findings and fully supported determinations about the relevant upward and downward departures in the various sentences, the new sentencing hearings may be limited to a determination of the proper base offense level based on the quantity of drugs involved
 
 
 [8]
 The court also considered Sterling's arrangement for bail money and legal representation for various coconspirators just before increasing the criminal history category. These remarks by the district court leave us uneasy. We review the reasonableness of sentencing guideline departures "in light of the district court's explanations for its departure at the time of sentencing." Id. at 558. While the court supplied an acceptable reason for its ultimate decision, it also suggested that the departure was at least in part based on Sterling's efforts to secure legal representation for his cohorts and to post bail money. Neither of those endeavors would provide an adequate basis for increasing a defendant's criminal history category
 
 
 [9]
 A stipulation read to the jury explained that none of the defendants had any part in murdering Lockett